## Nolan et al. v. Miniard et al.

June 7, 1946.

A. Joe Asher and G. G. Rawlings for appellants.

Astor Hogg for appellees.

OPINION OF THE COURT BY JUDGE LATIMER—Reversing.

Appellants by this action sought judgment in the sum of $2000 against appellees for wrongfully entering upon their land, and without their consent, or knowledge, removing timber therefrom. Answering the petition filed in the action, the defendants below, jointly and severally, denied specifically each and every allegation of the petition, and prayed its dismissal. On the day set for trial, defendants filed an amended answer in which they state that it may be true that a small amount of timber was taken from within the plaintiffs' claimed boundary as set out in the petition, but that the plaintiffs do not own that part of the land because the defendant, Miniard, owned and claimed the land by adverse possession, and prayed as in their original answer.

Plaintiffs objected to the filing of this amended answer but immediately thereafter filed reply, and the cause proceeded promptly to trial. Upon the trial the jury found for the plaintiffs in the sum of $30.00 and judgment was entered upon that verdict. Plaintiffs appeal.

Appellants insist that the judgment should be reversed for the following reasons: (1) Defendants were allowed over the objection of plaintiffs to file an amended answer on the day of trial, such amendment changing the defense completely, without notice to plaintiffs. (2) Because the remarks of the Court to the jury after the case had been under submission, over the objection of plaintiffs, were prejudicial to the interest of plaintiffs. (3) Because the verdict of the jury for plaintiffs was grossly inadequate and contrary to the overwhelming evidence.

There is no merit in appellants' contention that the amended answer should not have been filed. He would have been entitled to this defense under the general denial of his answer, and even if the amended answer

had changed the defense and set up a new one, he still would have been permitted to file it, but the plaintiffs would have been entitled to a continuance. While objection was made to the filing of the petition, this record does not reveal any effort upon the part of the plaintiffs to postpone the trial by asking for a continuance.

We find considerably more difficulty when confronted with the second ground. It appears that after some deliberation, the jury returned into open court and made certain inquiries of the court as follows:

"Juror: How much timber had been cut over on the Nolan side?

"Court: Where the largest amount was cut, was on the 100 acres—according to E. M. Miniard—was the oldest one of all patents.

"Mrs. Skidmore, Juror: What does 'Withdraw' argument have; does that have any bearing on it?

"Court: That was an agreement that the Turner patent overlapped the Miniard patent.

"Mr. Asher (Counsel for Plaintiffs): They have a right to take that agreement and consider it.

"Court: That agreement shows for itself; they had a law suit.

"Mrs. Skidmore, Juror: That did not settle any title?

"Court: Not the way I look at it.

"Mrs. Skidmore, Juror: What does 'Withdraw' mean?

"Mr. Asher: That is for you Jurors to consider and give it the value they consider it."

Objections and exceptions were made to the above.

In order to get a full understanding of the significance of these questions and answers, it will be necessary to state here some of the evidence which occasioned the above questions. The land of the appellee, Miniard, joins on the north the land of the appellant, Nolan. The particular land in question involves three original patents. The Miniard land involves what is known as the 300 acre Miniard patent and the 100 acre Miniard

patent, and the land of the plaintiffs is covered by what is called the Turner patent. The 100 acre Miniard patent is the oldest of the three, bearing date January 18, 1851. The William Turner patent is next, bearing date June 11, 1852, and the William Miniard 300 acre patent bears date October 14, 1852. The William Turner patent overlaps the Miniard 100 acre patent in its southwest portion to the extent of 31.4 acres. It also overlaps the Miniard 300 acre patent outside of the 100 acre Miniard patent to the extent of about 5.2 acres, and the William Miniard 300 acre patent overlaps the Miniard 100 acre patent to the extent of about ½ of it. The timber that was cut herein, or the greater portion of it, was cut in those boundaries of land included within the 5.2 acres outside the 100 acre Miniard patent, but inside the 300 acre Miniard patent, and that portion of the tract where the Turner patent overlaps the 100 acre Miniard patent.

The appellee claims that since his 100 acre patent was the older, the trees cut within the overlapped portion in the 100 acres were his and that in the 5.2 acres lying outside of the 100 acre tract, although his patent covering that portion was junior to the Turner patent, it was yet his because he had had it under open, notorious and adverse possession for about 60 years. Obviously there was some dispute between the Miniards and the Turners as to the exact boundary line for in the deed bearing date January 24, 1871, wherein Turner conveyed the land to John Nolan, grandfather of appellant, we find these words:

"The said Turner doth warrant and forever defend to the said John Nolen and his heirs forever, from the said Turner and his heirs and assigns, and from all the other persons claiming the same in any manner whatsoever. Excepting on the first tract of the 643 acre survey * * * That this is to be distinctly understood should either of surveys above mentioned run over an older patented land. The said Wm. Turner or is not responsible to Nolen for damage. Said John Nolen is to leave to the Miniard's all necessary timber to carry on their farm, and not enclose too near said Miniards."

It appears further that there was some litigation between the Miniards and John Nolan. There is introduced into this record an agreement signed by the Min-

iards, which was entered at the June 1884 term of the Harlan Circuit Court, in which John Nolan binds himself to pay the Miniard heirs the sum of $260 for land in controversy between them and William Turner, Sr., deceased, which land Nolan had purchased from William Turner, and which is described precisely as the description of land in the Turner patent. The agreement further provides:

The above named heir, Israel Miniard, Walter Miniard, William Miniard, Jonah Napier, Polly Joseph and Susan Miniard agrees for the said consideration $260. dollars to draw the suit on said land above mentioned it being the two tracts that John Nolen is concerned in to draw the suit so far as John Nolen is concerned and the said Miniards is to draw the suit and said Miniards &c, and Nolen is to pay their own cost of the suit.''

Obviously, the appellant, Nolan, under the above agreement, was claiming title to that overlapped portion in the 100 acre tract and also the 5.2 acres in the 300 acre tract, if there was any question as to it by reason of the overlapping surveys.

The appellee admitted going over the boundary line in a portion of the 5.2 acre tract. His testimony is conflicting as to where the major portion of the timber was cut. Under cross-examination these questions were asked and answered:

''16. You did cut 34,000 feet of timber in the vicinity below the hundred acre survey, 5.2 acres? A. There is supposed to be about an acre cut in timber, and then on through here, we cut 34,000.

''17. Within the past year? A. Hardly 34,000 but almost.''

On re-direct examination his attorney asked, and he answered, as follows:

''1. You said 34,000 feet was cut in this area right in here—that was on your senior 100 acre survey? A. Every tree of it.''

Evidently he was claiming then, by that last answer, that the larger portion of the timber was cut on the land he was claiming by reason of his senior patent. This

land also was claimed by the appellant under the agreement, even though the patent was senior to his.

In the light of the above, the effect of the questions and answers can readily be seen. A juror asked, "How much timber had been cut over on the Nolan side?" and the court answered, "Where the largest amount was cut, was on the 100 acres," which was the oldest one of of the patents. This, in effect, was the equivalent of saying the senior patent settled that question. The court was then asked: "What bearing does the agreement have" and if it settled any title. The court replied: "Not the way I look at it." Obviously, these statements were very prejudicial to the appellants' cause. For this reason we feel constrained to reverse the judgment below. Thus concluding, it becomes unnecessary to discuss the other questions raised herein, all of which are specifically reserved.

The surveyor's exhibits herein are very unsatisfactory in that no calls are shown thereon. In much of the testimony, descriptive of portions of the map, the witness merely said "right here" or "just as my finger runs" (indicating). This type of testimony convevs little or no information to us. The description of the land, as set out in appellants' petition, is the description found in a quitclaim deed by F. M. Sackett to A. C. Nolan. It is impossible for this court to determine whether or not the calls therein correspond in any measure with the old Turner survey or patent. The agreement, although it sets up the style of the case in the Harlan Circuit Court, in no way informs us as to the basis of the action upon which that agreement rests. Upon another trial, in order to do justice to all parties concerned, it would be well to introduce into the evidence here a survey of this land based upon the description, if that is the proper description, in the Sackett deed, and further develop the matter of the suit which culminated in the 1884 agreement. Upon a retrial of this cause, this should be done.

The judgment is reversed.